### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| **MARY VANDENBROUCKE**, individually and on behalf of all others similarly situated, | Case No. _____8:24-cv-00004_____ |
| Contact through attorneys: Barnow and Associates, P.C., 205 W. Randolph St., Suite 1630, Chicago, IL 60606 | CLASS ACTION |
| County of Residence: Montgomery County, MD | JURY TRIAL DEMANDED |
| **Plaintiff**, | |
| v. | |
| **THE RETINA GROUP OF WASHINGTON, PLLC**, | |
| Address: 7501 Greenway Center Drive, Suite 300, Greenbelt, Maryland 20770 | |
| County of Residence: Prince George's County, MD | |
| **Defendant**. | |

### CLASS ACTION COMPLAINT

Plaintiff Mary Vandenbroucke ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant The Retina Group of Washington, PLLC ("RGW" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

### INTRODUCTION

1.     Plaintiff brings this class action against RGW for its failure to secure and safeguard her and approximately 455,935 other individuals' personally identifying information ("PII") and

personal health information ("PHI"), including names, Social Security numbers, driver's license numbers or other government-issued identification numbers, medical record numbers, addresses, telephone numbers, email addresses, dates of birth, dates of service, and other demographic information as well as health, payment, and insurance information.

2.     RGW is a healthcare company that provides retinal care in Maryland, Virginia, and Washington, D.C.

3.     On or about March 26, 2023, RGW discovered that an unauthorized third party had gained access to its network system and acquired files containing information about RGW's current and former patients (the "Data Breach").

4.     RGW owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. RGW breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its patients' and former patients' PII/PHI from unauthorized access and disclosure.

5.     As a result of RGW's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach, which RGW says it learned of on or about March 26, 2023.

6.     Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the Maryland Unfair and Deceptive Trade Practices Act, and seeks

declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Mary Vandenbroucke*

7.     Plaintiff Mary Vandenbroucke is a citizen of Maryland.

8.     Plaintiff obtained healthcare or related services from RGW. As a condition of receiving services, RGW required Plaintiff to provide them with her PII/PHI.

9.     Based on representations made by RGW, Plaintiff believed RGW had implemented and maintained reasonable security and practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to RGW in connection with receiving healthcare services provided by RGW.

10.     At all relevant times, RGW stored and maintained Plaintiff's PII/PHI on its network systems.

11.     Plaintiff takes great care to protect her PII/PHI. Had Plaintiff known that RGW does not adequately protect the PII/PHI in its possession, she would not have obtained services from RGW or agreed to entrust them with her PII/PHI.

12.     Plaintiff received a letter from RGW notifying her that her PII/PHI was acquired in the Data Breach.

13.     As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

*Defendant The Retina Group of Washington, PLLC*

14.    Defendant The Retina Group of Washington, PLLC is a professional limited liability company which was formed in Virginia with its principal place of business at 7501 Greenway Center Drive, Suite 300, Greenbelt, Maryland 20770. RGW may be served through its registered agent: CSC-LAWYERS INCORPORATING SERVICE COMPANY, 7 St. Paul Street, Suite 820, Baltimore, MD 21202.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from RGW's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16.    The Court has personal jurisdiction over RGW because it has its principal place of business in Maryland and transacts significant business in Maryland.

17.    Venue properly lies in this District because, *inter alia*, RGW's principal place of business is located in this District, RGW transacts substantial business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District

## FACTUAL ALLEGATIONS

### *Overview of RGW*

18.    RGW claims to be "the largest . . . retinal and macular care practices in the country."[1] RGW has locations in Maryland, Virginia, and Washington, D.C.[2]

---

[1] *Who We Care For*, THE RETINA GROUP OF WASHINGTON, https://www.rgw.com/adult-pediatric-retina-patients/ (last accessed Jan. 2, 2024).
[2] *Locations*, THE RETINA GROUP OF WASHINGTON, https://www.rgw.com/retina-center-locations/ (last accessed Jan. 2, 2024).

19.     RGW's website contains a Notice of Privacy Practices ("Privacy Policy"), which is issued by PRISM Vision Group.[3] The Privacy Policy explains "the ways [RGW] may use and disclose medical information."[4]

20.     In the Privacy Policy, RGW states that it is required by law to "make sure that medical information that identifies you is kept private."[5] RGW further states it will "notify individuals, either known or reasonably believed to be affected, following a breach of unsecured protected health information."[6]

21.     According to the Privacy Policy, RGW will not disclose patients' health information (except as described therein) without prior written authorization.[7]

22.     Plaintiff and Class members are current or former patients of RGW and entrusted RGW with their PII/PHI.

### The Data Breach

23.     On or about March 26, 2023, RGW "began experiencing difficulty accessing information in some of [its] systems."[8] RGW determined that the Data Breach "resulted in the unauthorized acquisition of some of [its] patients' information."[9]

24.     RGW determined that the stolen data may include: "patient name, Social Security number, driver's license number or other government-issued identification number, medical record

---

[3] *Notice of Privacy Practices*, PRISM VISION GROUP, https://www.rgw.com/privacy-notice/ (last accessed Jan. 2, 2024).
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Notice of Data Breach*, THE RETINA GROUP OF WASHINGTON, https://www.rgw.com/notice-of-data-breach/ (last accessed Jan. 2, 2024).
[9] *Id.*

number, address, telephone number, email address, date of birth, date of service, and/or other demographic information as well as health, payment, and/or insurance information."[10]

25.    Despite learning of the Data Breach on March 26, 2023, RGW did not report the Data Breach to the U.S. Department of Health and Human Services until December 22, 2023.

### RGW Knew that Criminals Target PII/PHI

26.    At all relevant times, RGW knew, or should have known, that the PII/PHI that it collected and stored was a target for malicious actors. Indeed, RGW was clearly aware of the threat of a data breach, as it promised to inform Class members if a data breach occurred. [11]

27.    Despite such knowledge, RGW failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that RGW should have anticipated and guarded against.

28.    Despite such knowledge, RGW failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that RGW should have anticipated and guarded against.

29.    It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") and medical information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

---

[10] *Id.*
[11] *Notice of Privacy Practices*, *supra* note 3.
[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, Bus. Insider (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

30.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[13] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[14]

31.     PII/PHI is a valuable property right.[15] The value of PII/PHI as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[18] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

32.     As a result of the real and significant value of this material, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This

---

[13] *See* PROTENUS, *2023 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/breach-barometer-report (last accessed Jan. 2, 2024).

[14] *See id.*

[15] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[16] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[17] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[18] *See* IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

33.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[19] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[20]

34.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[21] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[22]

35.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[23] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what

---

[19] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data*") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[20] *Id.*
[21] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[22] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[23] *What Happens to Stolen Healthcare Data*, *supra* note 19.

you want them to do."[24]

36.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

37.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

38.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26,27]

39.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[24] *Id.*

[25] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/2023015560?seq=1.

[26] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Jan. 2, 2024).

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[28]

40.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[29]

41.    Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN. Thus, a new SSN will not be provided until after the harm has already been suffered by the victim.

42.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[30]

43.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[31] It "is also more difficult to detect,

---

[28] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[29] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Jan. 2, 2024).

[30] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[31] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

taking almost twice as long as normal identity theft."[32] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [33] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[34]

44.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

   a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

   b.    Significant bills for medical goods and services neither sought nor received.

   c.    Issues with insurance, co-pays, and insurance caps.

   d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

   e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

   f.    As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

   g.    Phantom medical debt collection based on medical billing or other identity information.

---

[32] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 22.
[33] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Jan. 2, 2024).
[34] *Id.*

h.      Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[35]

45.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[36]

46.     It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace, having been stolen by criminals willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

### Damages Sustained by Plaintiff and Class Members

47.     Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

---

[35] *See* Dixon & Emerson, *supra* note 31.
[36] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

## CLASS ALLEGATIONS

48.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

49.    Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All United States residents whose PHI/PII was compromised in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

50.    Excluded from the Class is The Retina Group of Washington, PLLC, and its affiliates, parents, subsidiaries, employees, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

51.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. RGW has reported to the United States Department of Health and Human Services that the Data Breach affected approximately 455,935 persons.[37]

53.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

> a.    Whether RGW had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;
>
> b.    Whether RGW had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

---

[37] *Cases Currently Under Investigation*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Jan. 2, 2024).

c.  Whether RGW failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d.  Whether an implied contract existed between Class members and RGW, providing that RGW would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e.  Whether RGW engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

f.  Whether RGW breached its duties to protect Plaintiff's and Class members' PII/PHI; and

g.  Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

54.     RGW engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

55.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by RGW, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

56.     Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

57.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against RGW, so it would be impracticable for Class members to individually seek redress from RGW's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

58.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

59.     RGW owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

60.     RGW knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. RGW knew or should have known of the many data breaches that targeted healthcare providers that collect and store PII/PHI in recent years.

61.     Given the nature of RGW's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, RGW should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

62.     RGW breached its duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

63.     It was reasonably foreseeable to RGW that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

64.     But for RGW's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

65.     As a result of RGW's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to

their PII/PHI which remains in RGW's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

66.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67.     RGW's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

68.     RGW's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as RGW, of failing to employ reasonable measures to protect and secure PII/PHI.

69.     RGW violated HIPAA Privacy and Security Rules and Section 5 of the FTCA, by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. RGW's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

70.     RGW's violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

71.     Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

72.     The harm occurring as a result of the Data Breach is the type of harm that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

73.     It was reasonably foreseeable to RGW that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

74.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of RGW's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences

of the Data Breach; (v) the continued risk to their PII/PHI which remains in RGW's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

<u>**COUNT III**</u>
**BREACH OF FIDUCIARY DUTY**

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Plaintiff and Class members gave RGW their PII/PHI in confidence, believing that RGW would protect that information. Plaintiff and Class members would not have provided RGW with this information had they known it would not be adequately protected. RGW's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between RGW and Plaintiff and Class members. In light of this relationship, RGW must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

77. Due to the nature of the relationship between RGW and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon RGW to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of RGW's data security policies and practices, and RGW was in an exclusive position to guard against the Data Breach.

78. RGW has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI, failing

to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

79.    As a direct and proximate result of RGW's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in RGW's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

<u>COUNT IV</u>
**BREACH OF IMPLIED CONTRACT**

80.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.    In connection with receiving healthcare services or employment, Plaintiff and all other Class members entered into implied contracts with RGW.

82.    Pursuant to these implied contracts, Plaintiff and Class members paid money to RGW and provided RGW with their PII/PHI. In exchange, RGW agreed to, among other things, and Plaintiff understood that RGW would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

83.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and RGW, on the other hand. Indeed, as set forth *supra*, RGW recognized the importance of data security and the privacy of its clients' PII/PHI in its Privacy Policy. Had Plaintiff and Class members known that RGW would not adequately protect its clients' PII/PHI, they would not have received healthcare services from RGW.

84.     Plaintiff and Class members performed their obligations under the implied contract when they provided RGW with their PII/PHI and paid for healthcare services from RGW, or provided RGW with their labor.

85.     RGW breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

86.     RGW's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

87.     Plaintiff and all other Class members were damaged by RGW's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of

the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT V**
**UNJUST ENRICHMENT**

88.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.    This claim is pleaded in the alternative to the breach of implied contract claim.

90.    Plaintiff and Class members conferred a monetary benefit upon RGW in the form of monies paid for healthcare services, or in the form of labor which enabled RGW to run its business, and through the provision of their PII/PHI.

91.    RGW accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. RGW also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate billing services or employment.

92.    As a result of RGW's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made or labor with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments or labor without reasonable data privacy and security practices and procedures that they received.

93.    RGW should not be permitted to retain the money belonging to Plaintiff and Class members because RGW failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

94.    Plaintiff and Class members have no adequate remedy at law.

95.    RGW should be compelled to provide for the benefit of Plaintiff and Class members

all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT VI**

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT,**
**Md. Comm. Law Code §§ 13-101,** *et seq.* **("MCPA")**

96.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if

fully set forth herein.

97.    Plaintiff and Class members are "Consumers" pursuant to MCPA § 13-101(c).

98.    RGW is a "Merchant" pursuant to MCPA § 13-101(d).

99.    Plaintiff, Class members, and RGW are each a "Person" under MCPA § 13-

101(h).

100.    RGW committed "Unfair or Deceptive Trade Practices" under § 13-301 of the

MCPA by failing to provide adequate data security while telling Plaintiff and Class members

that it will adequately keep their PII/PHI private.

101.    The MCPA provides fifteen (15) examples of what constitutes an unfair,

abusive, or deceptive trade practice. *See* MCPA § 13-301. RGW's actions constitute an unfair,

abusive, or deceptive trade practice in at least the following categories:

a.    "False, falsely disparaging, or misleading oral or written statement,

visual description, or other representation of any kind which has the

capacity, tendency, or effect of deceiving or misleading consumers"

MCPA § 13-301(1);

23

b. "Representation that . . . [c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not" MCPA § 13-301 (2)(iv);

c. "Failure to state a material fact if the failure deceives or tends to deceive" MCPA § 13-301 (3); and

d. "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he subsequent performance of a merchant with respect to an agreement of sale, lease, or rental" MCPA § 13-301 (9)(iii).

102.    Had Plaintiff and Class members been aware of the omitted and misrepresented facts, *i.e.*, that RGW would not adequately protect their PII/PHI, Plaintiff and Class members would not have provided their PII/PHI to RGW.

103.    Pursuant to MCPA § 13-408, Plaintiff brings this claim on behalf of herself and all other Class members for the damages that they have experienced as a result of the Data Breach.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against RGW as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seek appropriate injunctive relief designed to prevent RGW from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: January 2, 2024                        Respectfully submitted,

_/s/ Gary E. Mason_
Gary E. Mason (MD Bar # 15033)
Danielle L. Perry*
Lisa A. White*
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Telephone: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com
Email: lwhite@masonllp.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
Email: b.barnow@barnowlaw.com
Email: aparkhill@barnowlaw.com

*Counsel for Plaintiff and the proposed Class*

*\*pro hac vice forthcoming*