IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE RETINA GROUP OF
WASHINGTON DATA SECURITY
INCIDENT LITIGATION

:

: Consolidated No. DKC 24-0004

:

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this data breach class action are the motions for attorney fees (ECF No. 38) and for final approval of the class action settlement filed by Jennifer Boehles, Kwame Dapaah-Siakwan, Natalia Girard, Sharon Jenkins, Desiree McCormick, David Puckett, Katherine Traynham, Shalane Vance, Mary Vandenbroucke ("Named Plaintiffs"). (ECF No. 42). Named Plaintiffs have also filed supplements to their motion for settlement approval. (ECF Nos. 46; 51). The court held a fairness hearing on July 15, 2025. For the following reasons, the motions will be granted in part and the case dismissed.

**I.  Background**

Defendant Retina Group of Washington, PLLC ("Defendant") is a "healthcare company that provides ophthalmology and vision care services." (ECF No. 35-1, at 8). On March 26, 2023, Defendant experienced a data breach (the "Data Breach" or "Data Incident"), potentially exposing the personally identifiable information and/or personal health information of the Named Plaintiffs and approximately 450,000 individuals ("Settlement Class," and

together with Named Plaintiffs, "Plaintiffs"). (*Id*.). Multiple lawsuits were filed against Defendant, and eventually, the lawsuits were consolidated. (ECF Nos. 35-1, at 9; 20). On March 18, 2024, Plaintiffs filed an amended consolidated class action complaint (the "Complaint"). (ECF No. 21). On May 2, 2024, Defendant filed a motion to dismiss for lack of jurisdiction and failure to state a claim. (ECF No. 29). On June 17, 2024, Plaintiffs filed a response in opposition. (ECF No. 32). On July 1, 2024, Defendant filed a reply in support of its motion to dismiss. (ECF No. 33).

On August 30, 2024, the case was reassigned to Judge Lisa W. Wang, Court of International Trade, sitting in the United States District Court for the District of Maryland by designation. Following arms-length negotiations with counsel, (ECF No. 35-3, at 3), Plaintiffs and Defendant (the "Parties") reached a settlement agreement ("Settlement Agreement") and notified the court on December 5, 2024. (ECF No. 34). On January 21, 2025, Plaintiffs filed an unopposed motion for preliminary approval of the class action settlement. (ECF No. 35). On February 18, 2025, Judge Wang granted the motion, concluding that "[t]he terms of the Settlement Agreement are preliminarily approved as fair, reasonable, and adequate." (ECF No. 36, at 3). Judge Wang also preliminarily certified the class; preliminarily approved the

settlement subject to further consideration at the final fairness hearing; appointed Named Plaintiffs to serve as class representatives; appointed Ben Barrow, Gary M. Klinger, and Tyler J. Bean to serve as class counsel ("Class Counsel"); appointed Verita Global, LLC to serve as the settlement administrator ("Settlement Administrator"); approved the class notice, claim, and exclusion and objection process; approved the notice protocols; and scheduled a final fairness hearing. (ECF No. 36, at 1-11).

The preliminarily approved Settlement Agreement created a Settlement Class of approximately 450,000 individuals consisting of residents of the United States identified on the Settlement Class List whose personal information may have been involved in the data security incident on or about March 26, 2023, and who do not meet an exclusion. (ECF Nos. 36, at 1-2; 35-2, at 7; 42-1, at 9).

The Settlement Agreement called for a settlement fund ("Settlement Fund") of $3,600,000 to be used for notice and claims administration costs, any taxes owed, service awards to Named Plaintiffs, attorneys' fees and costs, and benefits to the Settlement Class Members, with any remaining amount to be donated to the Maryland Bar Foundation, Inc. (ECF No. 35-2, at 8, 14). In exchange, the Settlement Class would agree to release all claims

3

arising out of the Data Incident. (ECF Nos. 35-2, at 36; 35-3, at 4).

The notice was mailed to 449,129 Settlement Class members. (ECF No. 42-1, at 14). Verita estimates that the notices reached 91% of the Class. (*Id.*). Approximately 39,869 notices came back as undeliverable for which a search turned up no other updated address. (*Id.*). The Settlement Administrator also created a settlement website and a toll-free call line. As of May 20, 2025, there were 1,253 calls made to the call line. (*Id.* at 15).

On May 9, 2025, Plaintiffs filed an unopposed motion for attorneys' fees, reimbursement of expenses, and service awards for the Named Plaintiffs. (ECF No. 38). On May 23, 2025, Plaintiffs filed an unopposed motion for final approval of class action settlement. (ECF No. 42). On June 10, 2025, the case was reassigned to the undersigned, and a fairness hearing was scheduled for July 15, 2025. (ECF No. 44). On June 13, 2025, after consulting counsel, the court denied Defendant's motion to dismiss as moot in light of the Parties' settlement. (ECF No. 45). On June 30, 2025, Plaintiffs filed a supplement to their motion for final approval of class action settlement. (ECF No. 46). The supplement stated that twenty-three class members opted out of the Settlement Agreement, and two class members filed a joint objection to the Settlement Agreement. (ECF No. 46, at 2-3). No objectors

appeared at the July 15, 2025 fairness hearing.  After the hearing, Plaintiffs filed a Second Supplement, updating the claim information and clarifying the expected amount of costs for notice and administration expenses. (ECF No. 51).

## II.  Analysis

After considering the terms of the Settlement Agreement; the motion for attorneys' fees, reimbursement of expenses, service awards for Named Plaintiffs, final approval of the settlement, and final certification of the class; and the statements of counsel for both Parties at the final fairness hearing held on July 15, 2025, the court concludes that Plaintiffs have sufficiently demonstrated standing, the Settlement Class should receive final certification; the Settlement Agreement is fair, reasonable, and adequate; and Class Counsel's request for attorneys' fees and expenses, as well as service awards for the Named Plaintiffs, should be granted in part.

### A.  Standing

Defendant's initial response to the Complaint was to move to dismiss, both for lack of standing and for failure to state a claim. (ECF No. 29, at 1).  After the Parties reached a settlement, Defendant stated that the motion was moot, and the court denied Defendant's motion on that ground. (ECF No. 45).  Later, however,

the court directed the Parties to address the standing issue at the fairness hearing.[1]  (ECF No. 49).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

> In evaluating a class action complaint, "we analyze standing based on the allegations of personal injury made by the named plaintiffs." *See Beck [v. McDonald]*, 848 F.3d [262,] [] 269 [(4th Cir. 2017)] (citing *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011)). And class plaintiffs cannot meet their burden to establish standing "[w]ithout a sufficient allegation of harm to the named plaintiff in particular." *Id.* (quoting *Doe*, 631 F.3d at 160). When a complaint is evaluated at the pleading stage, however, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and alterations omitted). Accordingly, "we accept as true" the "allegations for which there is sufficient

---

[1] Even if the Parties no longer dispute standing, the court must ensure Plaintiffs have standing. *See Frank v. Gaos*, 586 U.S. 485, 492 (2019) (per curiam) (finding that a federal court's obligation to ensure standing "extends to court approval of proposed class action settlements").

> 'factual matter' to render them 'plausible on [their] face.'" *See Beck*, 848 F.3d at 270 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619-20 (4th Cir. 2018).

> Additionally, "when the actions of a third party are involved, '[t]he case or controversy limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Springmeyer v. Marriott Int'l, Inc.*, No. 20-cv-867-PWG, 2021 WL 809894, at *2 (D.Md. Mar. 3, 2021) (alteration in original) (quoting *Doe v. Obama*, 631 F.3d 157, 161 (4th Cir. 2011)).

*Gordon v. Zeroed-In Technologies, LLC*, No. 23-CV-3284-BAH, 2025 WL 936415, at *4 (D.Md. Mar. 26, 2025).

Standing analysis differs depending on the stage of the litigation: pleading, summary judgment, or trial. *Beck*, 848 F.3d at 270; *Lujan*, 504 U.S. at 561. Ultimately, "every class member must have Article III standing in order to recover individual damages." *TransUnion*, 594 U.S. at 431. In the class action settlement context, however, "federal courts lack jurisdiction if no named plaintiff has standing." *Frank*, 586 U.S. at 492 (citing *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)). This case settled at the pleading stage, before the court had addressed Defendant's motion to dismiss. The Parties assume

that Plaintiffs must only meet the pleading standard to secure federal court jurisdiction necessary for approval of their Settlement Agreement. Thus, Plaintiffs must clearly allege facts demonstrating each element of Article III standing.

### 1. Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally-protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 (1991)).

> [W]hile it is true that threatened rather than actual injury can satisfy Article III standing requirements, . . . not all threatened injuries constitute an injury-in-fact. Rather, as the Supreme Court has emphasized repeatedly, an injury-in-fact must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract.

*Hutton*, 892 F.3d at 621 (quoting *Beck*, 848 F.3d at 271). As recently discussed by Judge Hurson in *Gordon*, 2025 WL 936415, at *5, two cases from the United States Court of Appeals for the Fourth Circuit guide the standing analysis in data breach cases. *See Beck*, 848 F.3d at 274-75 (holding that a threat of future risk of identity theft alone is not sufficient for standing); *Hutton*, 892 F.3d at 622 (distinguishing *Beck* and holding that allegations of actual misuse such as identity theft and credit card fraud are

enough for injury in fact). Judge Hurson found that the allegations in his case were more like those in *Hutton*, because "all Plaintiffs except two set forth allegations of actual misuse." *Gordon*, 2025 WL 936415, at *5. Judge Hurson detailed the various allegations of the plaintiffs, including specific allegations of "loss of privacy, diminished value of [personally identifying information], fraud and identity theft, imminent threat of fraud and identity theft, out-of-pocket expenses and lost time and productivity spent remedying or mitigating the Data Breach's impacts, and emotional harm." *Id.* at *4-5. Additionally, several plaintiffs alleged that their information was found on the dark web. *Id.* at *5. Accordingly, Judge Hurson found that the plaintiffs had alleged injury in fact sufficient for standing. *Id.* at *5-6.

Similarly, Plaintiffs allege that because of the Data Breach, Plaintiffs are at increased risk of identity theft, (ECF No. 21 ¶¶ 68-71), they lost time mitigating the risk of identity theft and fraud (*Id.* ¶¶ 72-73), the value of their private information was diminished (*Id.* ¶¶ 74-76), they will incur future costs of credit and identity theft monitoring (*Id.* ¶¶ 77-78), they experienced a loss of the benefit of the bargain of Defendant's medical services (*Id.* ¶ 79), and they suffered fear, anxiety, and stress. (*Id.* ¶ 82).

Additionally, seven of the nine Named Plaintiffs have alleged separate additional injuries. Named Plaintiff Kwame Dapaah-Siakwan "contact[ed] financial institutions to sort out fraudulent activity on their accounts," "replac[ed] impacted debit cards," "suffered injury in the form of experiencing fraudulent charges, for approximately $20, to his Wells Fargo debit card, in or about November 2023, which, upon information and belief, was caused by the Data Breach," experienced "his credit score being damaged, which, upon information and belief, was caused by the Data Breach," and he "experience[d] an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach." (*Id.* ¶¶ 95-102).

"Soon after the Data Breach," Named Plaintiff Jennifer Boehles "received notices from several financial institutions with which she has accounts, including Chase Bank, Discover, and Bank of America, that her account information may have been tampered with and/or otherwise compromised," and she "received multiple targeted phishing emails attempting to further misuse her [p]rivate [i]nformation." (*Id.* ¶¶ 107-108). Named Plaintiff Shalane Vance "suffered injury in the form of her credit score being damaged, which, upon information and belief, was caused by the Data Breach," and she "experience[d] an increase in spam calls, texts, and/or emails, which, upon information and belief,

10

was caused by the Data Breach." (*Id.* ¶¶ 115-116).  Named Plaintiff Sharon Jenkins "experience[ed] an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach." (*Id.* ¶ 122).

Named Plaintiff Natalia Girard "suffered injury in the form of her Private Information being disseminated on the dark web, according to CreditWise, which, upon information and belief, was caused by the Data Breach." (*Id.* ¶ 128).  Named Plaintiff David Puckett "experience[ed] an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. (*Id.* ¶ 134).  Lastly, Named Plaintiff Desiree McCormick also "experience[ed] an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach." (*Id.* ¶ 140).  Therefore, these Named Plaintiffs have alleged actual misuse of their personal information.

Additionally, Judge Hurson found that the two plaintiffs who had not alleged actual misuse still "adequately pled imminent threat of identity theft" because "[t]he allegations about the targeting of personal information in the cyberattack and the allegations of identity theft by other plaintiffs whose personal information was stolen makes the threatened injury sufficiently imminent." *Gordon*, 2025 WL 936415, at *6 (quoting *In re Marriott*

*Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 460 (D.Md. 2020)).

Similarly, Named Plaintiffs Katherine Traynham and Mary Vandenbroucke who have not alleged actual misuse have still alleged "imminent threat of identity theft" because the specific allegations of actual misuse by the other Named Plaintiffs make "the threatened injury sufficiently imminent." Accordingly, Plaintiffs have sufficiently alleged injuries in fact sufficient for standing at the pleading stage.

### 2. Traceability

The "fairly traceable" requirement of standing "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Gordon*, 2025 WL 936415, at *9 (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000)). At the same time, "[t]he fairly traceable standard is not equivalent to a requirement of tort causation." *Id.* at *10 (quoting *Friends of the Earth, Inc.*, 204 F.3d at 161) (citation modified). "It must simply be *plausible* that the [] data breach was the cause of [plaintiff's] injury." *Id.* (quoting *Bank of La. v. Marriott Int'l, Inc.*, 438 F.Supp.3d 433, 441 (D.Md. 2020)). "In data breach cases, traceability is satisfied where the complaint 'contain[s] allegations demonstrating that it is both plausible and likely that a breach

12

of the [] database resulted in the fraudulent use of the [p]laintiffs' personal information.'" *Id.* at *9 (quoting *Hutton*, 892 F.3d at 623). Specifically, "Fourth Circuit courts have routine[ly] found traceability in the data breach context where plaintiffs provided defendants with [personally identifying information] and those defendants subsequently fell victim to a targeted data breach resulting in the disclosure and misuse of plaintiffs' [personally identifying information]." *Id.* (quoting *Capiau v. Ascendum Mach., Inc.*, No. 3:24-CV-00142-MOC-SCR, 2024 WL 3747191, at *7 (W.D.N.C. Aug. 9, 2024)).

As the plaintiffs in *Gordon*, Plaintiffs have alleged that they gave their personally identifying information and personal health information to Defendant, and Defendant experienced the Data Breach that involved Plaintiffs' personally identifying information and personal health information. (ECF No. 21 ¶¶ 19, 28). As discussed above, Named Plaintiffs have alleged that their personally identifying information has been misused following the data breach. (*Id.* ¶¶ 100-102, 107-108, 115-116, 122, 128, 134, 140). Therefore, accepting these allegations as true, the Complaint alleges sufficiently that it is plausible and likely that Defendant's data breach "resulted in the fraudulent use of the Plaintiffs' personal information."

### 3.    Redressability

In their Complaint, Plaintiffs seek damages and injunctive relief.  (ECF No. 21, at 38).  For an injury to be redressable, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560 (1991) (quoting *Simon*, 426 U.S. at 38, 43).  "[I]n a breach of data case, 'there is no reason to believe that monetary compensation will not return plaintiffs to their original position completely.'"  *Hutton*, 892 F.3d at 621 n.8 (quoting *Beck*, 848 F.3d at 274 n.5).  Plaintiffs seek damages, among other relief, in their Complaint.

Plaintiffs sufficiently alleged all three standing elements for the pleading stage; accordingly, Plaintiffs satisfy the threshold requirement to demonstrate standing.

### B.  Rule 23 Class Certification

For a class action to be certified pursuant to Federal Rule of Civil Procedure 23, the class must meet each of the four prerequisites identified in Rule 23(a) and fit within one of the three categories identified in Rule 23(b).  Fed.R.Civ.P.  23.  District courts must pay "undiluted, even heightened, attention" to these requirements when certifying a class for the purpose of settlement.  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Grice v. PNC Mortg. Corp. of Am.*, No. 97-cv–3084-

PJM, 1998 WL 350581, at *2 (D.Md. May 21, 1998) ("Despite the parties' agreement, class certification must be carefully scrutinized.").

### 1.   Rule 23(a) Prerequisites

Under Rule 23(a), a group of plaintiffs may sue in a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

The Settlement Class meets the numerosity, commonality, typicality, and adequacy requirements.  First, the class contains approximately 450,000 people, a number that far exceeds that which has met the numerosity requirement in other cases, and joinder would certainly be impracticable.  *CASA de Md., Inc. v. Arbor Realty Tr., Inc.*, No. 21-CV-1778-DKC, 2024 WL 1051120, at *3 (D.Md. Mar. 11, 2024) ("A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical." (quoting *Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F.Supp. 1404, 1408 (D.Md. 1984))).

Second, there are multiple questions of law and fact that are common to all of the class members, such as:

15

    1. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PHI/PII compromised in the Data Incident;

    2. Whether Defendant's data security systems prior to and during the Data Incident complied with applicable data security laws and regulations;

    3. Whether Defendant's data security systems prior to and during the Data Incident were consistent with industry standards;

    4. Whether Defendant owed a duty to Settlement Class Members to safeguard their PHI/PII;

    5. Whether Defendant breached its duty to Settlement Class Members to safeguard their PHI/PII;

    6. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

    7. What damages Plaintiffs and Settlement Class Members suffered as a result of Defendant's misconduct; and

    8. Whether Plaintiffs and Settlement Class Members are entitled to actual and/or statutory damages.

(ECF No. 35-1, at 21). These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See CASA de Md., Inc.*, 2024 WL 1051120, at *3 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Third, the Named Plaintiffs' claims are typical of the claims of the Settlement Class. As Plaintiffs point out, all the claims "arise from the same Data Incident," and Plaintiffs allege that the private information of the Named Plaintiffs and the other

16

members of the Settlement Class was compromised in the Data Incident. (ECF Nos. 35-1, at 22; 21, at 28). Although the Named Plaintiffs may have suffered different impacts from the Data Incident than every member of the Settlement Class, "a sufficient relationship exists between the injury to the named plaintiff[s] and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Id.* (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 217 (D.Md. 1997)). Named Plaintiffs allege that they and all other class members were injured in the same Data Incident; therefore, they have met the typicality requirement.

Lastly, Named Plaintiffs and Class Counsel are adequate class representatives. "Representation is adequate if: (1) the named plaintiff's interests are not opposed to those of other class members, and (2) the plaintiff's attorneys are qualified, experienced, and capable." *Id.* (quoting *Graham v. Famous Dave's of Am., Inc.*, No. 19-cv-0486-DKC, 2022 WL 17584274, at *5 (D.Md. Dec. 12, 2022)). Plaintiffs assert that "[n]either [Named Plaintiffs] nor their counsel have any interests antagonistic to the proposed Settlement Class." (ECF No. 35-1, at 22). Additionally, Class Counsel are "qualified, experienced, and capable." Class Counsel assert that they are "experienced in leading class cases efficiently and effectively and have the

17

support of all counsel of record." (*Id.*).  Class Counsel declare that they "have adequately represented the Settlement Class by fully investigating the facts and legal claims; preparing the complaints; researching, analyzing, and responding to Defendant's motion to dismiss, and negotiating and reaching a Settlement at arm's length, in good faith, and without collusion." (ECF No. 35-3, at 5).  Additionally, Class Counsel has "decades of combined experience as vigorous class action litigators." (*Id.*, at 7).

Accordingly, the four requirements set out in Fed.R.Civ.P.23(a) have been met.

### 2.   Rule 23(b) Requirements

Additionally, a class must meet the requirements of one of the three categories in Federal Rule of Civil Procedure 23(b). This case falls into Rule 23(b)(3), which applies when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Under Rule 23(b)(3):

> The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

18

> (B) the extent and nature of any litigation
> concerning the controversy already begun by or
> against class members; [and]
> (C) the desirability or undesirability of
> concentrating the litigation of the claims in
> the particular forum[.]

*CASA de Md., Inc.*, 2024 WL 1051120, at *4 (quoting *Amchem*, 521 U.S. at 620) (stating that district courts do not need to analyze the fourth factor of "the likely difficulties in managing a class action," when deciding whether to certify a class for settlement purposes only).

As discussed above, there are common questions of law and fact among the class members, specifically, that the claims all stem from the same Data Incident and whether Defendant's security measures were adequate. (ECF No. 35-1, at 23). Additionally, there is no indication that any other class members are litigating claims on their own. Further, a class action is superior to individual litigation because litigating similar claims of around 450,000 people would be inefficient. (ECF No. 35-1, at 24). Therefore, the requirements under Rule 23(a) and Rule 23(b)(3) are met, and the court will grant final certification of the Settlement Class.

## C.   Final Approval of the Settlement Agreement

Under Rule 23(e), the claims of a certified class can only be settled with the court's approval. The court must conduct a hearing and make a "finding that it is fair, reasonable, and

adequate" prior to approving a settlement agreement that binds the class. Fed.R.Civ.P. 23(e)(2). "In doing so, the court's 'primary concern . . . is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations.'" *CASA de Md., Inc.*, 2024 WL 1051120, at *4 (quoting *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991)).

### 1.   Fairness and Reasonableness

When evaluating the fairness and reasonableness of a proposed settlement agreement, courts consider: "(1) the presence or absence of collusion among the parties; (2) the posture of the case at the time settlement is proposed; (3) the extent of discovery that has been conducted; and (4) the circumstances surrounding the negotiations and the experience of counsel." *Id.* (quoting *Graham*, 2022 WL 17584274, at *7). "The purpose of this inquiry is to protect against the danger that counsel might agree to settle for an inadequate amount to secure a fee." *Id.* (quoting *Graham*, 2022 WL 17584274, at *7).

The fairness factors weigh in favor of final approval. There is no indication of collusion among the Parties. Class Counsel declared that the Settlement Agreement was reached after "protracted and intense arm's-length negotiations that took place over an extended period of time." (ECF No. 42-1, at 26). Additionally, before discussing a settlement, the Parties

20

"completed an extensive investigation and exchanged informal discovery." (*Id.*) The Parties had also already briefed Defendant's motion to dismiss. (ECF Nos. 29, 32, 33).[2] Both Parties were represented by "highly experienced attorneys familiar with class action litigation-and data breach class actions, in particular" and were familiar with the legal and factual issues of data breach cases. (ECF No. 42-1, at 26).

### 2. Adequacy

> When evaluating whether a proposed settlement is adequate, courts consider: "(1) the relative strength of the plaintiff's case on the merits and probability of success at trial; (2) the anticipated duration and expense of additional litigation; (3) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (4) the degree of opposition to the settlement." *Graham*, 2022 WL 17584274, at *7 (quoting *Singleton* [v. *Domino's Pizza, LLC*], 976 F.Supp.2d [665] [] [,] 679 [(D.Md. 2013)]). "The purpose of this inquiry is to 'weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement.'" *Id.* (quoting *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F.Supp. at 1384).

*CASA de Md., Inc.*, 2024 WL 1051120, at *5.

Overall, the adequacy factors weigh in favor of final approval. Defendant moved to dismiss Plaintiffs' Complaint for

---

[2] As discussed above, although that motion was denied as moot (ECF No. 45), the court directed the Parties to address the standing issue at the fairness hearing. (ECF No. 49).

standing and failure to state a claim; however, the court denied
as moot Defendant's motion to dismiss in light of the Parties'
settlement.  (ECF No. 45).  Therefore, at this stage it is not
even certain Plaintiffs would have survived a motion to dismiss,
let alone succeed at trial.  Plaintiffs acknowledge that "[d]ata
breach cases, in particular, face substantial hurdles in surviving
past the pleading stage and are among the riskiest and most
uncertain types of litigation." (ECF No. 42-1, at 22).  Plaintiffs
also point to "the developing nature of this area of law," as
contributing to the uncertainty of their success on the merits.
(*Id.* at 23).

In contrast, Plaintiffs assert that the Settlement allows the
Settlement Class to receive benefits now, including mitigation
benefits through credit monitoring, instead of waiting for
uncertain benefits that may materialize years down the line.  (ECF
No. 42-1, at 23-24).  Plaintiffs also contend that continued
litigation would incur significant costs and delay from "costly
discovery involving experts regarding damages, motions for summary
judgment, a motion for class certification, and one or more
interlocutory appeals." (*Id.* at 24).  Instead, the Settlement
Fund of $3,600,000 would allow Settlement Class members to make a
claim for:

> (1) reimbursement for ordinary documented
> losses up to $300.00; (2) compensation for up

> to four hours of lost time compensated at a
> rate of $25 per hour; (3) reimbursement for
> extraordinary documented losses up to
> $5,000.00; (4) twenty-four months of three-
> bureau credit monitoring and identity theft
> monitoring services; [or] (5) a pro rata
> Alternative Cash Payment estimated to be $100.

(*Id.*). The Settlement Agreement also benefits Settlement Class members by creating "certain business practice changes and remedial measures" by Defendant to protect against future data breaches. (*Id.*).

According to Plaintiffs' supplemental filing, as of the postmarked deadline to opt out or object to the Settlement, out of approximately 410,000 Settlement Class members who received notice, only twenty-three members opted out, and two have filed a joint objection. (ECF Nos. 42-1, at 25; 46, at 2). Plaintiffs assert that "[t]he small number of opt-outs do not undercut the conclusion that the Settlement satisfies the adequacy requirement." (ECF No. 42-1, at 25). In light of the large number of people who received notice, twenty-three opt-outs does not weigh against the adequacy of the Settlement Agreement.

Plaintiffs contend that the court should overrule the joint objection because it does not provide a reason to deny the final approval of the Settlement. (ECF No. 46, at 3). In relevant part, the joint objection states that:

> First, we have neither observed or do we find
> any credible evidence or arguments presented

23

> that [Defendant] has been or is negligible in
> the secure protection of our medical and
> personal records. Second, it is common
> knowledge that clever teams of hackers using
> today's technology and computers can break
> into almost any system. Third, this
> settlement will help drive up medical costs
> for us all. And fourth, the payout to any
> given patient is a pittance and the primary
> benefit will be to the law firms involved.

(ECF Nos. 46-1, at 19; 46-2, at 2).

As Plaintiffs note, the joint objection does not attack the Settlement Agreement itself; rather, it objects to the lawsuit overall. The objection does not assert that the Settlement Agreement itself is unfair, inadequate, or unreasonable. Plaintiffs argue that the attorneys' fees are reasonable and in line with attorneys' fees awarded in similar cases. (ECF No. 46, at 4). As will be discussed below, the attorneys' fees will be reduced slightly. Therefore, the joint objection is not a strong "degree of opposition," and it does not weigh strongly against finding that the Settlement Agreement is adequate. The objection is, in effect, overruled.

Additionally, Plaintiffs assert that there is no evidence that Defendant is in danger of insolvency, and therefore, this factor is neutral and does not weigh against granting approval of the final settlement. (*Id.*). Overall, given the uncertainty of Plaintiffs' success in litigation, and the delay and expense involved in continued litigation, the amount offered in the

24

Settlement Agreement is a positive result for the Settlement Class members. Therefore, the Settlement Agreement will be approved.

**D.    Attorneys' Fees, Expenses, and Service Awards**

Under Rule 23, a court may "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). Plaintiffs request attorneys' fees of $1,200,000, which is 33.33% of the Settlement Fund, as set out in the Settlement Agreement.  (ECF No. 38, at 1, 6).  Plaintiffs also request reimbursement of litigation expenses of $2,637.20, and service awards of $2,000 for each of the nine Named Plaintiffs. (*Id.* at 1, 13).

**1.    Attorneys' Fees**

> "In determining whether an attorney's fee award is reasonable, courts generally take two approaches: (1) the 'percentage of recovery' or 'percentage of the fund' method; or (2) the 'lodestar' method." *Graham*, 2022 WL 17584274, at *10 (quoting *Singleton*, 976 F.Supp.2d at 681).  "Although this circuit has not decided which approach to adopt, the 'current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.'"  *Id.* (quoting *Singleton*, 976 F.Supp.2d at 681). When the percentage of the fund method is used, it is supplemented with a lodestar cross-check.

*CASA de Md., Inc.*, 2024 WL 1051120, at *6.

**a.    "Percentage of the Fund" Method**

> "Under the percentage of the fund method, the court awards attorneys' fees as a percentage

25

of the common fund used to pay class members."
*Graham*, 2022 WL 17584274, at *10 (first citing
*Blum v. Stenson*, 465 U.S. 886, 900 n.16
(1984); then citing *Singleton*, 976 F.Supp.2d
at 681).  When using the percentage of the
fund method, district courts in this circuit
typically analyze: "(1) the results obtained
for the class; (2) the quality, skill, and
efficiency of the attorneys involved; (3) the
risk of nonpayment; (4) objections by members
of the class to the settlement terms and/or
fees requested by counsel; (5) awards in
similar cases; (6) the complexity and duration
of the case; and (7) public policy."  *Id.*
(quoting *Singleton*, 976 F.Supp.2d at 682).
"The factors 'need not be applied in a
formulaic way,' and no one factor is
necessarily dispositive."  *Id.* (quoting
*Singleton*, 976 F.Supp.2d at 682).

*CASA de Md., Inc.*, 2024 WL 1051120, at *6.

### i.  Results Obtained for the Class

Class counsel negotiated a non-reversionary Settlement Fund of $3.6 million, which allows for Settlement Class members to receive either "(1) reimbursement for ordinary documented losses up to $300.00; (2) compensation for up to four hours of lost time compensated at a rate of $25 per hour; (3) reimbursement for extraordinary documented losses up to $5,000.00; [and] (4) twenty-four months of three-bureau credit monitoring and identity theft monitoring services," or "a *pro rata* Alternative Cash Payment estimated to be $100." (ECF No. 42-1, at 24).  The claims deadline was June 23, 2025, and it is not clear how many claims for reimbursement for ordinary losses, lost time, or extraordinary

losses will receive final approval. As of Plaintiffs' supplemental filing on July 18, 2025, 14 out of 43 claims for ordinary losses were approved, none of the 13 claims for extraordinary losses were approved, all of the 764 claims for lost time were approved, all of the 1,832 claims for credit monitoring were approved, and all of the 12,810 claims for the pro rata cash payment were approved. (ECF No. 51, at 2). Plaintiffs now estimate that the pro rata cash payment will be approximately $143.16 per eligible claimant. (*Id.*, at 3).

Given the uncertainty of Plaintiffs' success had they litigated this lawsuit, this is a positive and beneficial result for the Settlement Class.

Additionally, the Settlement Class members received a benefit in the form of Defendant agreeing to "implement enhanced data security measures that will protect Settlement Class Members' personal information that is still in its possession." (ECF No. 38, at 7).

### ii. Quality, Skill, and Efficiency of the Attorneys Involved

Settlement Class Counsel are experienced data breach and class action litigators. Counsel briefed a motion to dismiss, participated in informal discovery, and negotiated a favorable deal with a motion to dismiss still pending. (ECF Nos. 38, at 8; 29; 32; 33). "Settlement Class Counsel's collective history

27

provided them with sufficient leverage to negotiate an excellent result for the Settlement Class." (ECF No. 38, at 8).

### iii. Risk of Nonpayment

> "In determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis." *Boyd* [*v. Coventry Health Care Inc.*], 299 F.R.D. [451,] [] 464 [(D.Md. 2014)] (quoting *Jones v. Dominion Res. Servs., Inc.*, 601 F.Supp.2d 756, 762 (S.D.W.Va. 2009)). "The risk undertaken by class counsel is evaluated by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled." *Id.* (first citing *Jones*, 601 F.Supp.2d at 762; then citing *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F.Supp. 499, 503 (E.D.Va. 1995) (finding that risks to plaintiffs' counsel were minimized by settlement within six-months from the filing of the complaint and consequently reducing the percentage award from 30% to 25% of the Settlement Fund)).

*CASA de Md., Inc.*, 2024 WL 1051120, at *7 (finding that litigating a case for over two years before settling further showed the risk to counsel). This case posed a meaningful risk of nonpayment because Class Counsel litigated the case on a contingency fee basis, "risking their own time and resources in litigation in a relatively new area of law." (ECF No. 38, at 8). Additionally, it was far from clear they would have been able ultimately to prevail in litigation had they not reached a settlement. Counsel,

however, litigated the case for around one year before settling. The initial complaint was filed on January 2, 2024 (ECF No. 1), and on December 5, 2024, Class Counsel notified the court that a settlement had been reached. (ECF No. 34). This length of time minimizes the risk to Class Counsel, and accordingly, it is appropriate to reduce the percentage award from 33.33% to 30%.

### iv. Objections

Settlement Class members were notified by mail of the proposed settlement, including the requested attorneys' fees. (ECF No. 38, at 9). Only two Settlement Class members objected, and they filed a joint objection. (ECF Nos. 46-1, at 19; 46-2, at 2). The joint objection opposed the litigation overall, and while they mentioned the benefit to the law firm, they did not specifically object to the amount of attorneys' fees requested. (*Id.*). Instead, they objected in general that "the payout to any given patient is a pittance[,] and the primary benefit will be to the law firms involved." (*Id.*). Additionally, no Settlement Class members objected at the fairness hearing on July 15, 2025. The lack of objections to the specific amount of attorneys' fees "tends to show that at least from the class members' perspective, the requested fee is reasonable for the services provided and the benefits achieved by class counsel." *CASA de Md., Inc.*, 2024 WL 1051120, at *7.

**v.   Awards in Similar Cases**

In *Boyd*, which also involved a $3.6 million settlement fund, this court determined that:

> In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3[ld] Cir. 2001); [*In re*] *The Mills Corp.* [*Sec. Litig.*], 265 F.R.D. [246,] [] 263–64 (E.D.Va. 2009) ("comparing the size of the fund and percentage of the award in other cases to the present case . . . provides a valuable point of reference."). Fees awarded under "the percentage-of-recovery" method in settlements under $100 million have ranged from 15% to 40%. *See Stoner v. CBA Information Services*, 352 F.Supp.2d 549, 553 (E.D.Pa. 2005). Cases in this circuit involving settlement comparable to the $3.6 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to 28% of the common fund. See *In re SPX Corp. ERISA Litig.* (W.D.N.C. 2007) (28% of the fund awarded, where the fund was $3.6 million); *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *3 (M.D.N.C. 2007) (26% of the fund awarded where the fund was $4,750,000); *Mason v. Abbot Labs.* (N.D.W.Va. 2001) (25% of the fund awarded where the fund was $1,705,200); *Braun v. Culp, Inc.* (M.D.N.C. 1985) (25% of the fund awarded where the fund was $1.5 million). Furthermore, a recent study in the Journal of Empirical Studies found that for class recoveries in the range of $2.8 to $5.3 million, the mean attorneys' fee percentage award from 1993–2008 was approximately 26.4%, and the median was 25.0%. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J.Emp.L.Studies 248, 265 T.7 (June 2010).

*Boyd*, 299 F.R.D. at 465 (finding that attorneys' fees of 28% of the settlement fund was an appropriate balance given the range of awards); *see also CASA de Md., Inc.*, 2024 WL 1051120, at *7 (citing *Boyd* more recently to compare awards in similar cases and finding that attorneys' fees of 30% of the settlement fund is reasonable).

Additionally, in *CASA de Maryland, Inc.*, this court found it useful also to compare attorneys' fees awards in similar class actions. 2024 WL 1051120, at *7. In two other data breach settlement cases in this district, courts have found that attorneys' fees of 25% and 30% were appropriate. *Brent v. Advanced Med. Mgmt., LLC*, No. 23-CV-3254-JKB, 2024 WL 5118528, at *9 (D.Md. Dec. 16, 2024) (finding that a reduced award of 25% of the settlement fund was appropriate given the short timeline of the case and lack of complexity, as well as low risk due to an early settlement); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. 16-CV-3025-JKB, 2019 WL 3183651 at *7 (D.Md. July 15, 2019) (finding that class counsel's request of 30% of the settlement fund was reasonable in light of all the relevant factors and specifically the length and complexity of the case, including an appeal to the Fourth Circuit). Accordingly, compared to attorneys' fees approved in cases of similar fund sizes and similar litigation subjects, the reduced fee of 30% of the $3,600,000 Settlement Fund, or $1,080,000 is reasonable.

### vi.    Complexity and Duration of the Litigation

> "In evaluating the complexity and duration of
> the litigation, courts consider not only the
> time between filing the complaint and reaching
> settlement, but also the amount of motions
> practice prior to settlement, and the amount
> and nature of discovery." *Graham*, 2022 WL
> 1758427, at *11 (quoting *Singleton*, 976
> F.Supp.2d at 686). "Additionally, 'courts
> consider whether negotiations were hard
> fought, complex, or arduous.'" *Id.* (quoting
> *Singleton*, 976 F.Supp.2d at 686).

*CASA de Md., Inc.*, 2024 WL 1051120, at *7. As noted above, there

was around one year from the time Plaintiffs filed the initial

complaint until the time they reached a settlement. (ECF Nos. 1;

34). Class Counsel acknowledge that the "case settled at a

relatively early stage[;]" nevertheless, they contend that "it did

so only after extensive briefing by the Parties on Defendant's

[m]otion to [d]ismiss, substantive informal discussion, and a

vigorous, arms-length negotiation." (ECF No. 38, at 10). As Class

Counsel point out elsewhere, data breach litigation is a developing

area of law, creating additional uncertainty and perhaps

complexity in the litigation and negotiations. (ECF No. 42-1, at

22-23). In light of both the relatively short duration and the

complexity of the case the slightly reduced fee award is

appropriate.

### vii. Public Policy

> "[I]n assessing the reasonableness of the
> requested attorneys' fees, the court must

> strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that vindicate rights that might otherwise go unprotected, and perpetuating the public perception that class action plaintiffs' lawyers are overcompensated for the work that they do." *Boyd*, 299 F.R.D. at 466. Here, while litigating data breach cases is undoubtedly important, a large award in this case could perpetuate the public perception that plaintiffs' lawyers are overcompensated, given how short-lived the litigation was.

*Brent*, 2024 WL 5118528, at *8. In *Brent*, Judge Bredar found that a reduced fee of 25% of the settlement fund was appropriate, in part because of the short duration of the litigation. *Id.* There, the complaint was filed in state court in July 2023, removed to federal court in November 2023, stayed on December 6, 2023, the parties reached a settlement in principle on December 18, 2023, and they finalized the settlement agreement in April 2024. *Id.*

It furthers public policy to incentivize attorneys to litigate data breach cases and ensure that companies protect consumers' data. Additionally, Class Counsel worked on this case for a year before reaching a settlement, which was longer than the class counsel in *Brent* took to reach their preliminary settlement. Therefore, the slightly reduced fee of 30% strikes the appropriate balance.

    **b.**   **Lodestar Cross-Check**

> The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d [294, 306 (3ᵈ Cir. 2005), *as amended* (Feb. 25, 2005)] ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9ᵗʰ Cir. 2002)("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Importantly, "where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *In re Royal Ahold N.V. Securities*, 461 F.Supp.2d at 385 (quoting *Goldberger* [*v. Integrated Res., Inc.*], 209 F.3d [43, 50 (2ᵈ Cir. 2000)]).

*CASA de Md., Inc.*, 2024 WL 1051120, at *9 (quoting *Singleton*, 976 F.Supp.2d at 688). "When performing a lodestar cross-check, courts may 'accept as reasonable counsel's estimate of the hours they have spent working on the case.'" *Id.* (quoting *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 482-83 (D.Md. 2014)).

Counsel represent that they spend a total of 627 hours on the case, for a total of $439,568.20 in attorneys' fees. (ECF No. 38-1, at 8). Counsel multiplied each attorney or staff member's hours spent by that person's billable rates, and employed a multiplier

of 2.7 to reach their requested $1,200,000.00,[3] or 33.33% of the Settlement Fund. (ECF Nos. 38-1, at 8, 11-12, 38-3, at 5; 38-4, at 5; 38-5, at 2; 38-6, at 2; 38-7, at 2; 38-8, at 2). This number, however, includes work from counsel who were not approved as Class Counsel in the preliminary approval of the class action settlement. (ECF No. 36, at 3-4). Judge Wang appointed Ben Barnow from Barnow and Associates, P.C., Gary M. Klinger from Milberg Coleman Bryson Phillips Grossman PLLC, and Tyler J. Bean from Siri & Glimstad LLP. (*Id.*) Accordingly, only appointed Class Counsel and attorneys and staff from their respective firms will be considered for the lodestar cross-check.

Class Counsel's firm has spent a total of 496.6 hours,[4] for a combined fee of $348,292.70.[5] "Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." *CASA de Md., Inc.*, 2024 WL 1051120, at *9 (quoting *Boyd*, 299 F.R.D. at 467). Using Plaintiffs'

---

[3] It appears that this number is rounded up slightly, because $439,568.20 x 2.7 is $1,186,834.10.

[4] 208.3 (Barnow and Associates, P.C.) + 112.7 (Siri & Glimstad LLP) + 175.6 (Milberg Coleman Bryson Phillips Grossman PLLC) = 496.6. (ECF No. 38-1, at 8).

[5] $157,312.50 (Barnow and Associates, P.C.) + $62,110.00 (Siri & Glimstad LLP) + $128,870.20 (Milberg Coleman Bryson Phillips Grossman PLLC) = $348,292.70 (ECF No. 38-1, at 8).

35

lodestar multiplier of 2.7, the total comes to $940,390.30.[6]  This
amount is more consistent with the slightly reduced 30% of the
Settlement Fund, or $1,080,000, instead of the 33.33% Plaintiffs
requested.  Therefore, the slightly reduced fee award is reasonable
in this case.

**2.    Reimbursement for Litigation Expenses**

> "It is well-established that plaintiffs who
> are entitled to recover attorneys' fees are
> also entitled to recover reasonable
> litigation-related expenses as part of their
> overall award." *Boyd*, 299 F.R.D. at 468
> (quoting *Kabore v. Anchor Staffing, Inc.*, No.
> L-10-cv-3204-BEL, 2012 WL 5077636, at *10
> (D.Md. Oct. 17, 2012)).  "The Fourth Circuit
> has stated that such costs may include 'those
> reasonable out-of-pocket expenses incurred by
> the attorney which are normally charged to a
> fee-paying client, in the course of providing
> legal services.'" *Id.* (quoting *Spell v.
> McDaniel*, 852 F.2d 762, 771 (4ᵗʰ Cir.
> 1988) (internal quotations omitted)).
> "Examples of costs that have been charged
> include necessary travel, depositions and
> transcripts, computer research, postage,
> court costs, and photocopying." *Id.* (citing
> *Almendarez v. J.T.T. Enters. Corp.*, No. 06-
> cv-68-JKS, 2010 WL 3385362, at *7 (D.Md. Aug.
> 25, 2010)).

*CASA de Md., Inc.*, 2024 WL 1051120, at *9.  Plaintiffs request
reimbursement of $2,637.20 for litigation expenses, for research,
travel, and filing fees.  (ECF Nos. 38, at 12; 38-1, at 9; 38-3,
at 6; 38-4, at 5).  This appears reasonable and on the low end

---

    [6]  $348,292.70 x 2.7 = $940,390.30

compared to litigation expenses in similar cases. *See, e.g.*, *Brent* 2024 WL 5118528, at *10 (approving $25,273.37 in costs and expenses, with $19,172.50 of that stemming from mediation costs). Plaintiffs' request, however, again includes expenses from counsel who were not approved as Class Counsel. Accordingly, the court will grant $2,274.22[7] in litigation expenses for the approved Class Counsel.

### 3.    Settlement Administration Expenses

After the fairness hearing, Plaintiffs filed a second supplemental filing in support of final approval of the class action settlement. (ECF No. 51). Plaintiffs clarified that the Settlement Administrator's confirmed total costs of notice and administration to completion will be $395,000.00, assuming no supplemental distribution is needed. (ECF No. 51, at 2). Accordingly, the court will approve the Settlement Administrator's expenses.

### 4.    Reasonableness of the Service Awards

Plaintiffs request service awards of a total of $18,000 for the nine Named Plaintiffs, meaning $2,000 for each Named Plaintiff. (ECF No. 38, at 13). "Incentive payments are 'often awarded

---

[7] $355.50 (Barnow and Associates, P.C.) + $716.37 (Siri & Glimstad LLP) + $1,202.35 (Milberg Coleman Bryson Phillips Grossman PLLC) = $2,274.22 (ECF Nos. 38-1, at 12; 38-3, at 6; 38-4, at 5).

in Rule 23 class actions.'" *CASA de Md., Inc.*, 2024 WL 1051120, at *9 (quoting *Graham*, 2022 WL 17584274, at *12). "In determining whether an incentive payment is warranted, courts consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.* (quoting *Graham*, 2022 WL 17584274, at *12) (citation modified).

Plaintiffs assert that the average award per class representative is around $16,000, and this is far below that average. (ECF No. 38, at 14). Plaintiffs state that Named Plaintiffs "took active roles in the litigation, including reviewing pleadings, staying in regular contact with Settlement Class Counsel about [the] status of the case, remaining informed about settlement discussions, being available for consultation during the negotiation period, and reviewing and approving the settlement agreement." (*Id.* at 13). In light of Named Plaintiffs' participation and the relatively modest amount per Named Plaintiff, the court finds that the service awards are reasonable and approves the award of $2,000 to each Named Plaintiff.

### 5. **Maryland Bar Foundation, Inc. as the Non-profit Residual Recipient**

Plaintiffs request that pursuant to the Settlement Agreement, the court should approve the Maryland Bar Foundation, Inc. as the

non-profit residual recipient.  (ECF No. 42-1, at 27).  "Courts commonly approve *cy pres* distributions for unclaimed funds, such as the residue of a class settlement fund." *Curry v. Money One Fed. Credit Union*, No. 19-CV-3467-DKC, 2021 WL 5839432, at *3 (D.Md. Dec. 9, 2021) (citing *McDaniels v. Westlake Servs., LLC*, No. 11-cv-1837-ELH, 2014 WL 556288, at *11 (D.Md. Feb. 7, 2014)).  "The distribution is designed to put the funds 'to their next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" *Id.* (quoting *Klier v. Elf Atochem*, 658 F.3d 468, 474 (5th Cir. 2011)).

Plaintiffs assert that the Maryland Bar Foundation works to "[i]mprove and facilitate the administration of justice," and it provides grants to non-profit organizations in Maryland. (ECF No. 42-1, at 27).  Plaintiffs assert that many of the Settlement Class members live in or near Maryland, and the potential distribution to the Maryland Bar Foundation will benefit the Settlement Class members.  (*Id.* at 27-28).  Accordingly, the Maryland Bar Foundation, Inc. will be approved as the *cy pres* recipient.

## III. Conclusion

For the foregoing reasons, Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and service awards (ECF No. 38), will be granted in part and denied in part, and Plaintiffs' motion

for final approval of class settlement (ECF No. 42), will be

granted.  A separate order will follow.


                                    /s/
                           _____
                           DEBORAH K. CHASANOW
                           United States District Judge